UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DONALD G. V.,[1]

                         Plaintiff,             **DECISION AND ORDER**

v.

                                               1:20-cv-01550 (JJM)

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
_____

This is an action brought pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to review the final determination of the Commissioner of Social Security that plaintiff was not entitled to supplemental security income benefits ("SSI"). Before the court are the parties' cross-motions for judgment on the pleadings [12, 14].[2] The parties have consented to my jurisdiction [16]. Having reviewed their submissions [12, 14, 15], plaintiff's motion is granted.

## BACKGROUND

The parties' familiarity with the 4,093-page administrative record [8, 9, 10] is presumed. Further, the parties have comprehensively set forth in their papers plaintiff's treatment history and the relevant medical evidence. Accordingly, I refer only to those facts necessary to explain my decision.

---

[1]     In accordance with the guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Western District of New York on November 18, 2020 in order to better protect personal and medical information of non-governmental parties, this Decision and Order will identify the plaintiff by first name and last initial.

[2]     Bracketed references are to the CM/ECF docket entries. Page references to the administrative record are to the Bates numbering. All other page references are to the CM/ECF pagination.

After plaintiff's claim was initially denied ([8] at 12), an administrative hearing was held on October 30, 2019 before Administrative Law Judge ("ALJ") Robert Wright. See id. at 40-78 (transcript of hearing). On January 21, 2020, ALJ Wright issued a decision finding that plaintiff was not disabled. Id. at 12-21. Following an unsuccessful request for review with the Appeals Council (id. at 1-4), plaintiff initiated this action.

ALJ Wright found that plaintiff's severe impairments were "traumatic brain injury [TBI], partial hearing loss, adjustment disorder with depressed mood, anxiety disorder, and posttraumatic stress disorder (PTSD)".[3] Id. at 14. He also determined that plaintiff had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels", with additional limitations:

> "[C]annot perform work requiring fine hearing acuity and is limited to performing unskilled work that is simple, routine, and low stress, with the latter specifically defined as a job involving occasional decision making, change in the work setting, and interaction with others."

Id. at 15.

In discussing the evidence he used to support his RFC findings, ALJ Wright acknowledged that "the record contains no function by function assessments of the claimant's ability to perform work activities, though there are occasional general comments in the record about the claimant not being able to work". Id. at 19. To explain his RFC despite the lack of medical opinion evidence in the record, ALJ Wright reasoned:

> "Given the claimant's allegations as to the majorly deleterious effects of his motorcycle accident on his cognitive functioning, one would expect to see significantly worse clinical findings on mental status examination after the accident. That is not what the record shows, however. Instead, clinical findings on mental status examinations are occasionally positive for slight to significant

---

[3]   Plaintiff does not challenge ALJ Wright's findings concerning his severe impairments.

> memory deficits and a negative thinking pattern, but typically normal with respect to presentations, mood, affect, eye contact, alertness, orientation, speech, psychomotor activity, thought content, attitude, attention, concentration, impulse control, insight, judgment, and even recent and remote memory skills. . . . These records document a clear pattern of improvement over time, with more serious findings in early 2018 and largely normal findings observed as early as November 2018, which is less than 12 months after the alleged disability onset date".

Id. at 18. In addition, ALJ Wright cited the conclusions of two state agency medical consultants, both of whom reviewed the limited medical evidence in the file at the time, and concluded that as of the date of their reviews (May 1, 2018 and May 2, 2018), "[claimant] failed to return completed ADL and work [history] forms therefore there is insufficient evidence for adjudicative period". Id. at 19.[4]

ALJ Wright relied upon plaintiff's testimony concerning his activities, and evidence of the plaintiff's activities that existed in the medical records:

> "[T]he claimant's acknowledged daily activities are higher functioning than one would expect given his allegations of disability. Indeed, treatment reports in evidence consistently reference the claimant walking, driving/riding a car and his motorcycle, and even working on his motorcycle or other engines. . . . At [the] haring, the claimant also acknowledged performing simple chores and tasks such as mowing the lawn, taking out the garbage, bringing in the mail, going grocery shopping, driving his parents around for appointments and errands, reading the newspaper, and attending a Bible study at church. He cares for a pet cat. . . . A recent May 2019 report also indicates that the claimant is 'engaged in part-time "side work"'."

---

[4]  To the extent that the statements of the medical consultants (Administrative Record [8] at 1079-84, Exhibits 6F and 7F) could be considered evidence that plaintiff was not disabled, as opposed to statements that plaintiff had not submitted enough evidence to support his claim of disability, I note that the Social Security Administration received the bulk of the medical evidence in the file after May 2, 2018. See, e.g. id. at 1085, Exhibit 8F, e-filed June 13, 2019; id. at 1123, Exhibit 9F, e-filed June 14, 2019; id. at 1149, Exhibit 10F, e-filed July 8, 2019. Further, the majority of the treatments described in the treatment notes discussed by ALJ Wright took place after May 2, 2018. Accordingly, the state agency consultants did not review the majority of the medical evidence available to ALJ Wright and relevant to plaintiff's claims. Therefore, to the extent that their statements can be considered opinions, they are not substantial evidence that supports the RFC.

Id. at 16. Plaintiff testified that the primary problems that prevent him from working are "concentration, thinking, and hearing, back problems, and fatigue". Id. at 37. He also explained that "[j]ust thinking, and kind of comprehend[ing] is like really stressful and strenuous". Id. at 38. His mother helps him remember to go to appointments and take his medication. Id. at 39-40. Both of his parents remind him to do household chores. Id. at 41. ALJ Wright asserts that the RFC accommodates these difficulties because it "limits the claimant to performing simple, routine, and unskilled tasks, which the claimant is already doing (in addition to some more detailed tasks, such as shopping, working on the motorcycle, and reading the newspaper) on a daily basis". Id. at 16.

With respect to fatigue, plaintiff explained that he gets tired easily and has to "[g]o in and lay down on the couch . . . [a]bout three times a day" for one to two hours. Id. at 38. ALJ Wright reasoned that the RFC accommodated this complaint:

> "[Plaintiff] reported fatigue, but again, this is not really consistent with his activities of daily living or reports to treating providers. It is also inconsistent with the specific recent statement the claimant made to a treating provider. The claimant reported that certain medications he was taking were making him tired and that when he stopped taking them, he noticed that he was not feeling as tired. . . . Even if the claimant requires some of these medications and experiences some drowsiness as a result, I consider the resultant impact on his cognitive functioning amply accommodated by the restriction to simple, routine, unskilled work set forth above."

Id. at 17. ALJ Wright concluded that plaintiff's "allegations are undermined by subjective reports of significant improvement, inconsistent with his generally normal clinical findings on mental status examination, and not corroborated by any functional assessments of record. For these and other reasons articulated throughout this decision, I find the claimant's allegations

persuasive only to the extent that they are consistent with the residual functional capacity set forth above." Id. at 19.

## ANALYSIS

**A.     Standard of Review**

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938). It is well settled that an adjudicator determining a claim for DIB and/or SSI employs a five-step sequential process. Shaw, 221 F.3d at 132; 20 C.F.R. §§ 404.1520, 416.920. The plaintiff bears the burden with respect to steps one through four, while the Commissioner has the burden at step five. See Talavera v. Astrue, 697 F.3d 145, 151 (2d. Cir. 2012).

Plaintiff argues that the RFC is not supported by substantial evidence because ALJ Wright did not rely upon any medical opinions to support the RFC. Instead, he "relied on his own lay interpretation of the raw medical record". Plaintiff's Memorandum of Law [12-1] at 14. Further, the record did not contain "the sort of evidence that permitted the ALJ to make a common sense RFC determination, or one without medical opinion evidence". Id. at 17. In the absence of evidence of plaintiff's functional abilities, plaintiff argues that ALJ Wright had a "duty to develop the record" by contacting plaintiff's treating providers, ordering a consultative examination, or obtaining medical expert testimony. Id. at 19.

In response, the Commissioner argues that new regulations, effective for claims filed on or after March 27, 2017 (like this claim), effectively erased any requirement that an ALJ rely on medical opinion evidence to form the RFC, and permits the ALJ to base the RFC on other evidence in the record. See Commissioner's Memorandum of Law [14-1] at 5-8. "[C]ontrary to Plaintiff's suggestion that ALJs are unqualified to analyze 'raw data,' the regulations repeatedly assume that they are, including as a prerequisite to crediting medical opinions at all." Id. at 8. The Commissioner argues that the case law cited by the plaintiff, requiring the ALJ to rely upon functional opinion evidence, must "yield to the new, controlling regulations on the treatment of medical opinions", which "shifted focus away from medical opinions, toward the record at large", through four main changes:

> 1. "they removed the requirement that the ALJ 'weigh' medical opinions and stated that certain opinions could be given 'controlling weight,' which arguably implied that one opinion would win out";
>
> 2. "they now explicitly state that an ALJ will not 'defer' or 'give controlling weight' to any opinion";
>
> 3. "they removed an existing requirement in the Agency's rules that an ALJ seek out a medical source statement from the claimant's medical sources"; and
>
> 4. "they changed the evaluation factors to focus on the record-conscious factors of supportability and consistency, instead of the source-conscious factors of specialty and examination/treatment relationship".

Id. at 10-11. These changes, the Commissioner argues, permitted the ALJ to develop the RFC based upon the other evidence in the record, without any requirement that he obtain opinion evidence:

> "Nothing in the pertinent regulations requires a supportive medical opinion. On the contrary, the regulations pertaining to RFC state that an ALJ, not a medical source, assesses RFC based on the

>record at large.  20 C.F.R. § 404.1545(a).  The Social Security Ruling (SSR) pertaining to RFC likewise lists eleven types of evidence the ALJ must consider, without prioritizing medical opinions.  SSR 96-8p.  Meanwhile, the regulations pertaining to record development, consultative examiner, and medical experts include no mandate that the ALJ even seek a medical opinion under any circumstances.  *See* 20 C.F.R. 404.[1512], 404.1513, 404.1519a(a)."

Id. at 8.

**B.    ALJ Wright Failed to Support the RFC with Substantial Evidence**

I agree with plaintiff that the RFC here is not supported by substantial evidence. An ALJ is "duty-bound to review all of the evidence before her, resolving inconsistencies, and make a disability determination that is consistent with the evidence as a whole". Rice v. Commissioner, 2020 WL 4283894, *4 (W.D.N.Y. 2020).  Where an ALJ's decision "gives no clue" how the RFC "accommodates or takes into account . . . moderate mental limitations", the ALJ's findings at steps 4 and 5 of the sequential analysis are "unsupported by substantial evidence".  Reynolds v. Colvin, 2014 WL 4184729, *5 (N.D.N.Y. 2014).

I also agree with plaintiff that the changes to the regulations did not remove the requirement that the functional abilities in the RFC be based upon evidence in the record demonstrating the plaintiff's functional abilities in a competitive work setting.  While "the ALJ's RFC finding does not need to track any single medical opinion", and "an ALJ may make an RFC finding without opinion evidence, the RFC assessment will be sufficient only when the record is clear and contains some useful assessment of the claimant's limitations from a medical source". Kathy M. v. Commissioner of Social Security, 2021 WL 2619718, *5 (W.D.N.Y. 2021) (internal quotations and alterations omitted).  Here, where the record lacks both a functional assessment and clear evidence demonstrating the plaintiff's functional abilities, the new regulations will not save an RFC that is not supported by substantial evidence.

ALJ Wright characterizes plaintiff's medical record as containing "largely normal findings observed as early as November 2018, which is less than 12 months after the alleged disability onset date"[5] with "clinical findings on mental status examination [that] are occasionally positive for slight to significant memory deficits and a negative thinking pattern". Administrative Record [8] at 18.  ALJ Wright uses this evidence to support his assertion that plaintiff's allegations of disability "are undermined by subjective reports of significant improvement, inconsistent with his generally normal clinical findings on mental status examination, and not corroborated by any functional assessments of record".  Id. at 19.  However, the record is not as clear as ALJ Wright's decision suggests.  The RFC is not supported by substantial evidence for three reasons.

First, while ALJ Wright accurately cites the "largely normal" findings from plaintiff's neurology and mental health treatment records, he fails to identify, and then discuss, the findings in those same records support plaintiff's allegations.  For example, at plaintiff's July 11, 2019 visit to Dent Neurological Institute, his provider (Jessica R. Oswald, PA-C) notes plaintiff's report that he has "cognitively . . . remained stable", but that "[h]is memory continues to be poor".  Administrative Record [10] at 4071.  At that visit, "[m]emory cognition testing reveal[ed] a MoCA score of 17/30.  He scored a 1/5 on delayed recall, 0/3 on serial subtraction, 0/2 on abstraction" and "had difficulty with cube copying and word fluency".  Id. at 4073.  PA Oswald concludes that plaintiff's "deficits are likely permanent, and his is felt to not be able to work due to this".  Id.  At plaintiff's prior visit, on March 20, 2019, his "cognition [had]

---

[5]   This is factually incorrect.  Plaintiff alleged disability beginning on October 7, 2017.  Administrative Record [8] at 12.  November 2018 is greater than, not less than, 12 months from the alleged date of onset.

remained fairly stable" in PA Oswald's opinion. Administrative Record [8] at 1152. At that visit, it was noted that his last mini mental status examination score ("MMSE") was 27/30. Id.

Although it is true that plaintiff's MMSE score was in the normal range,[6] plaintiff's score on the Montreal Cognitive Assessment ("MoCA"), administered several months later, was in the range typical of those with Alzheimer's disease.[7] Although, "[a]s a general matter, the ALJ is not obligated to reconcile explicitly every conflicting shred of medical testimony", Raymer v. Colvin, 2015 WL 5032669, *5 (W.D.N.Y. 2015), given that courts are "wary of permitting an ALJ to use common sense to assess mental limitations, which are by their nature highly complex and individualized", Stoeckel v. Commissioner of Social Security, 2019 WL 5445518, *2 (W.D.N.Y. 2019), ALJ Wright's failure to acknowledge, let alone discuss, plaintiff's MoCA score demonstrates that his RFC is not based upon substantial evidence. ALJ Wright had an obligation to explain why he did not credit the MoCA score, while at the same time crediting the MMSE scores administered by the same treating provider. Felicia A. v. Commissioner of Social Security, 2021 WL 2153878, *2 (W.D.N.Y. 2021) ("[h]owever, where the ALJ's RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted. Thus, when an ALJ adopts only portions of a medical opinion, he must explain why he rejected the remaining portions"). Further, it is not clear from

---

[6] "Scores on the MMSE range from 0 to 30, with scores of 26 or higher being traditionally considered normal." "People with early stage Alzheimer's disease tend to score in the 19 to 24 range." "It's possible to achieve a very high score but still have significant cognitive deficits, especially in areas such as executive functioning that the MMSE is not designed to assess." Verywell Health: Overview of the Mini-Mental State Exam for Alzheimer's, https://www.verywellhealth.com/mini-mental-state-exam-as-an-alzheimers-screening-test-98623 (last visited July 26, 2022).

[7] "Scores on the MoCA range from zero to 30. A score of 26 and higher is considered normal. In the initial study data, normal controls had an average score of 27.4. People with mild cognitive impairment (MCI) scored an average of 22.1. People with Alzheimer's disease had an average score of 16.2." Verywell Health: Montreal Cognitive Assessment (MoCA) Test for Dementia, https://www.verywellhealth.com/alzheimers-and-montreal-cognitive-assessment-moca-98617#citation-2 (last visited July 26, 2022).

PA Oswald's treatment note how plaintiff's cognitive limitations, as measured by the MoCA, affect plaintiff's functional ability to perform work. PA Oswald did, however, state that plaintiff's "deficits are likely permanent" and contributed to plaintiff's inability to work. Administrative Record [10] at 4073. Whether plaintiff can work is a determination left to the Commissioner. 20 C.F.R. § 404.1520b(c). As such, ALJ Wright was not required to provide any analysis about this statement, id., however, PA Oswald's statement is an indication that she had an opinion concerning how plaintiff's cognitive impairments affected his functional abilities.

Second, ALJ Wright relied upon plaintiff's "acknowledged daily activities" to support his RFC. However, none of the activities listed in plaintiff's medical records, or those to which he testified, support ALJ Wright's conclusion that plaintiff can perform work-related activities on a full-time basis. See Melissa W. v Commissioner of Social Security, 2021 WL 972505, *6 (W.D.N.Y. 2021) ("the activities of daily living relied upon by the ALJ to discount Dr. Chruscicki's opinion do not meaningfully illuminate the fundamental question of whether plaintiff's severe impairments . . . would limit her ability to do any work-related activities on a full-time basis"). ALJ Wright points to records documenting plaintiff's reports that he walks, drives a car and a motorcycle, and works on his motorcycle or other engines. Administrative Record [8] at 16. ALJ Wright cites plaintiff's testimony that he performs simple chores "such as mowing the lawn, taking out the garbage, bringing in the mail, going grocery shopping, driving his parents around for appointments and errands, reading the newspaper, and attending a Bible study at church. He cares for a pet cat . . . A recent May 2019 report also indicates that the claimant is 'engaged in part-time "side work"'". Id. Nowhere, however, does ALJ Wright point to any evidence in the record suggesting that plaintiff performs any combination of these activities consistently, without reminders, or for the amount of time that would be expected for

full time work. To the contrary, plaintiff testified that his parents "[u]sually" need to remind him to do his chores, and his mother helps him remember to attend appointments and take his medications. Id. at 39-41. His counselor, James Babcock, LMSW, recorded plaintiff's report that, although plaintiff had been "trying to work at a job performing siding work", plaintiff's "short-term memory has been severely effected by the TBI and that has made it extremely difficult to complete tasks at work". Id. at 1124. Given the vocational expert's testimony, plaintiff's need for reminders could limit his ability to engage in work:

> "Q  In your experience, how would - - what if the hypothetical individual needed hourly reminders of the instructions, or to be retold the directions?
>
> A  [J]obs would not be available in the competitive jobs that we're referring to."

Id. at 50-51.

Finally, ALJ Wright failed to adequately address the plaintiff's symptoms of fatigue, and their effect on plaintiff's ability to function in a work setting, even with the limitations he imposed in the RFC. ALJ Wright states that plaintiff's reports of fatigue are "not really consistent with his activities of daily living or reports to treating providers". Id. at 17. ALJ Wright provides no references to the record or examples to support this statement, nor does he explain how any of the activities plaintiff described are inconsistent with experiencing fatigue during the day. Further, ALJ Wright asserts that plaintiff's reports of fatigue are "also inconsistent with a specific recent statement the claimant made to a treating provider. The claimant reported that certain medications he was taking were making him tired and that when he stopped taking them, he noticed that he was not feeling as tired". Id. ALJ Wright did not cite the treatment record indicating that his provider made him continue the medication:

> "Client reports that he spoke with his PCP in regards to stopping his medication. He reports, 'my doctor was not pleased [with] me stopping medication and he yelled at me and told me to keep taking them.' Client reports that he is back taking his medication, although he does not want to because he notes, 'my medication makes me sleepy.'"

Administrative Record [10] at 4013. Nor does he explain why plaintiff's attempt to determine if a medication was making him tired is inconsistent with plaintiff's claims of fatigue. If anything, plaintiff's statements recorded in the treatment notes actually support his allegation that he experiences fatigue that is related to his severe conditions.

Nonetheless, ALJ Wright concluded, "[e]ven if the claimant requires some of these medications and experiences some drowsiness as a result, I consider the resultant impact on his cognitive functioning amply accommodated by the restriction to simple, routine, unskilled work set forth above." Id. Plaintiff, however, testified that when he gets fatigued, he as to "go in and lay down on the couch". Id. at 38. He does this "[a]bout three times a day" for "[a]n hour, or two hours, depending how tired I am, take a nap". Id. Nothing in the record contradicts plaintiff's testimony. Despite ALJ Wright's assertion that his RFC "amply accommodate[s]" this symptom, he does not explain how a restriction to simple, routine, unskilled work accommodates plaintiff's alleged need to take a nap when he is affected by fatigue.

Given the vocational expert's testimony, the ALJ's acknowledgment and analysis of all the evidence concerning plaintiff's fatigue could be critical to the outcome of this claim if, for example, plaintiff were required to nap or rest during the workday in order to alleviate this symptom. The Vocational Expert testified upon questioning from ALJ Wright:

> "Q     Okay. Let me provide you with a second residual functional capacity similar to the first, but with the additional limitation that the person would be off task approximately 20 percent of the time. Are there any unskilled occupations an individual with that given profile could perform?

   A No, your Honor, there are not."

Administrative Record [8] at 50.  See Cosnyka v. Colvin, 576 Fed. Appx. 43, 46 (2d Cir. 2014) (Summary Order) ("[t]here is no evidence in the record to the effect that Cosnyka would be able to perform sedentary work if he could take a six-minute break every hour, rather than some other duration and frequency amounting to ten percent of the workday").

  Remand is therefore necessary for the ALJ to further develop the record concerning plaintiff's functional limitations and their effect on plaintiff's ability to function in a work setting, and to properly explain how the evidence supports his RFC.

## CONCLUSION

  For the reasons stated above, plaintiff's motion for judgment on the pleadings [12] is granted to the extent that this matter is remanded to the Commissioner for further proceedings consistent with this Decision and Order, and the Commissioner's motion for judgment on the pleadings [14] is denied.

**SO ORDERED**.

Dated: August 9, 2022

                   /s/ _____
                   JEREMIAH J. MCCARTHY
                   United States Magistrate Judge